UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BRANDON KEITH JACKSON                                                    CIVIL ACTION

VERSUS                                                                              NO. 20-2247

DR. ROBERT CLEVELAND, ET AL.                                      SECTION: "E"(1)

<u>REPORT AND RECOMMENDATION</u>

Plaintiff, Brandon Keith Jackson, a state prisoner incarcerated at the Rayburn Correctional Center ("RCC"), filed this *pro se* and *in forma pauperis* federal civil action pursuant to 42 U.S.C. § 1983. He sued Dr. Robert Cleveland, Nurse Michael Peters, Lt. Randall Williams, Floyd Brooks, Warden Billy Anderson, Sgt. Larry Daigle, and Lt. Douglas Brooks.[1]

## I.  Plaintiff's Complaint

In support of his complaint, plaintiff makes the following allegations:

On March 11, 2020, plaintiff was "sick and very weak," experiencing "stomach pain, headaches, back pain, chronic chest pains, and fully body weakness." He did not know what was wrong with him. As Sgt. Larry Daigle began removing plaintiff's restraints, he "fell out." Daigle, along with Lt. Randall Williams and Lt. Douglas Brooks,[2] as well as two other officers who have not been named as defendants herein,[3] told plaintiff "to get up." "[T]hey" then "slammed" plaintiff onto a stretcher and transported him to the prison medical unit; however, upon arrival, they reported to Dr. Robert Cleveland and Nurse Michael Peters, as well as another individual who has

---

[1] Rec. Doc. 1.
[2] Plaintiff refers to this individual in the complaint as "L.T Douglas"; however, the Court is assuming plaintiff is referring to Lt. Douglas Brooks, one of the defendants in this lawsuit.
[3] Lt. Hill and Maj. Wade Rigdon.

not been sued in the lawsuit, EMT Justin Rester, that there was nothing wrong with plaintiff. Dr. Cleveland, Peters, and Rester then likewise said nothing was wrong with plaintiff and told him to "get up and walk back." After plaintiff told them more than three times that he was unable to do so, Williams warned plaintiff he would be written up if he did not get off the stretcher. At that point, plaintiff was "force[d]" to get up, but he fell back to the floor, resulting in the others laughing at him. Dr. Cleveland then stated that plaintiff was trying to hurt himself and called Floyd Brooks, who apparently oversees mental health issues at the prison. Floyd Brooks, after being told by the others that plaintiff was attempting to hurt himself, placed plaintiff "on extreme suicide watch with four point restraints with helmet."

After plaintiff was returned to his unit, "they" falsely stated that he spat on Lt. Hill, and he was "physically dragged" to the shower by Williams, Daigle, and Douglas Brooks. As a result, plaintiff "pulled something in [his] back." While in the shower, he was forced to lie on the "nasty shower floor." After "awhile," Warden Billy Anderson ordered that plaintiff be returned to the medical unit and that Dr. Cleveland perform "a force cavity search of [plaintiff's] anus" while he was held down by Williams and Douglas Brooks. After no contraband was found during that cavity search, plaintiff was taken back to his unit in a wheelchair.

"A few minutes or so" later, plaintiff then again fell in his cell. This time, he hurt his neck, and was sent to the hospital. He first went to a hospital in Bogalusa and then was sent on to a different hospital in New Orleans. He was admitted to the hospital and diagnosed with "syncope, influenza A, sinus tachycardia, transaminitis, and hypertension." He remained in the hospital for four days.

Plaintiff alleges that as a result of the foregoing events, he "received head, neck, and back chronic injuries." He also alleges that the body cavity search caused him to suffer from a "mental health problem" resulting in him experiencing "night terror[s]" of him being raped and molested. He notes that he was previously molested when he was nine years old.

Plaintiff also alleges that he "received disciplinary write-ups" and was sentenced to five months in isolation. While he was in isolation, his mattress was taken for fifteen and one-half hours each day. During that time, he was "sleeping on [an] iron bed without [a] mattress."

Lastly, he alleges that all these actions were taken as means to retaliate against him for filing administrative grievances and a lawsuit.

Plaintiff attached to his complaint a copy of an administrative grievance he filed concerning the foregoing events, as well as the prison officials' responses thereto. The response at the first level of administrative review stated:

> Your complaint has been reviewed and investigated. Your medical record and the Unusual Occurrence Report (UORs) from the day in question were also reviewed.
> On March 11, 2020, at 9:25 am, while you were being unrestrained, you laid down on the floor stating that you hurt your neck. You were taken to the Infirmary via stretcher. You were examined by Nurse Michael Peters and Dr. Robert Cleveland, Health Care Authority. Your exam was normal with no injury noted. Once Dr. Cleveland cleared you to return to your housing unit, you rolled off the stretcher on to the floor. It was observed that you did not injure your head or neck. You were then placed on Extreme Suicide Watch with four point restraints.
> At 11:16 am, as you were being escorted to Sleet Unit from the Infirmary on a stretcher, because you refused to bend your knees to be taken in a wheelchair, you became belligerent, cursing officers and spitting on them. Lt. Randall Williams and CSM Johnny Hill directed your face away from the officers while giving you orders to stop resisting. Your behavior continued until a spit mask was placed on you. After the use of force ceased, you unclasped the stretcher belt and intentionally rolled off the stretcher onto the floor before the officers could stop you. You were seen by Nurse Michael Peters in Sleet Unit lobby for a post use or

force exam. You were upgraded from Extreme Suicide Watch with four point restraints to Extreme Suicide Watch with four point restraint with helmet.

You were ordered to walk to the shower for a visual body cavity search in accordance with Directive #4.5.1. You refused. Lt. Douglas Brooks placed his hands on you to escort you to the [sic] with assistance from Sgt. Larry Daigle. Once in the shower you continued to refuse all orders and to submit to the visual body cavity search. You were seen again by Nurse Michael Peters for a post use of force exam. You were then taken to the Infirmary for a forced visual body cavity search to be conducted by Dr. Cleveland. The visual body cavity search was conducted and revealed no contraband. You were seen by Nurse Reed Wallace for a post use of force exam after this incident and complained of chest pains. Dr. Cleveland was present and evaluated you and determined that the chest pain was not cardiac in origin and no treatment was necessary.

You were returned to your cell at 12:50 pm at which time you refused to get out of the wheelchair and go into your cell. You were assisted out of the chair and onto the bed by Lt. Randall Williams and Sgt. Larry Daigle. You were then restrained according to the Mental Health Management Orders. Emergency Medical Technician, Justin Rester conducted a post use of force exam and restraint check. No new injuries were noted.

At 1:21 pm you were let up from your bed to eat and use the toilet. When you were walking toward the toilet you fell striking your head on the wall when you attempted to get up you fell again striking your head on the toilet. You fell a third time before the cell entry team could enter your cell to assist you. You were evaluated by EMT Justin Rester and taken to the infirmary. Upon examination by medical staff, you were transported to Our Lady of the Angels Hospital (OLOAH). OLOAH transferred you to Medical Center of Louisiana-New Orleans where you were admitted and diagnosed with syncope, influenza A, sinus tachycardia, transaminitis and hypertension. You were released from the hospital on March 15, 2020. Prior to this hospitalization, no fever was noted at your medical encounters which would have triggered an influenza test.

Separate Use of Force Reviews were conducted by Colonel Donnie Seal and it was determined that only the necessary amount of force was used to gain your compliance. The amount of force was well within the use of force guidelines. Your medical needs were met timely and appropriately. There is no evidence to support your complaint. Your request for remedy is denied.[4]

Plaintiff appealed, and the response at the second and final level of administrative review

stated:

---

[4] Rec. Doc. 1, p. 12.

Your request for an Administrative review of ARP# RCC-2020-382 has been received. A qualified member of the Headquarters staff has reviewed your request in order to render a fair and impartial response.

All pertinent documentation surrounding your request, including the unusual occurrence reports, statements provided by the security staff and your medical/mental health records have been reviewed. None of the documents reviewed support your allegations. Through your own actions, staff was forced to use only the amount of force necessary to bring you into compliance with the verbal orders issued to you by staff. Also, per your medical/mental health records, you had no injuries; however, once your assessment was completed you were placed on extreme suicide watch with four point restraints. The medical/mental health staff addressed your concerns in an appropriate manner and in accordance with DOC Health Care Policy. Medical/Mental Health opinion is controlling. The response provided is clear and concise, as well as has addressed your request appropriately. You have failed to provide any evidence to substantiate your allegations or that would cause us to believe otherwise. As such, this office concurs with staff and finds no other investigation warranted.

Your request for relief is denied.[5]

## II. Motion to Dismiss

All of the defendants except Anderson, who has not yet been served, have filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[6] Plaintiff opposes that motion.[7]

Rule 12(b)(6) allows a defendant to move for dismissal when a plaintiff fails to state a claim upon which relief can be granted. In ruling on such a motion, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re* Katrina Canal Breaches Litigation, 495 F.3d 191, 205 (5th Cir. 2007) (quotation marks omitted). However, "[t]o survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts to state a claim to relief that is plausible on its face. Factual allegations must be enough to raise a right to relief

---

[5] Id. at p. 13.
[6] Rec. Doc. 16. Although the defendants' motion also summarizes the law concerning Rule 12(b)(1), they set forth no argument explaining why they would be entitled to dismissal under that provision. Therefore, this Report and Recommendation will address only Rule 12(b)(6).
[7] Rec. Doc. 18.

above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. (citation, footnote, and quotation marks omitted).  On that point, the United States Supreme Court has explained:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations and quotation marks omitted).

Broadly construing plaintiff's complaint,[8] the Court finds that, given the foregoing allegations, plaintiff is asserting the following claims:  deliberate indifference to serious medical needs; excessive force; illegal body-cavity search; improper placement in disciplinary segregation with deprivation of a mattress; and retaliation.

### A.  Deliberate Indifference to Serious Medical Needs

The United States Supreme Court has held:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under [42 U.S.C.] § 1983.

Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (footnotes, citation, and internal quotation marks omitted).

---

[8] The Court must liberally construe a *pro se* civil rights complaint.  See Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994).

"A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." <u>Gobert v. Caldwell</u>, 463 F.3d 339, 345 n.12 (5th Cir. 2006). In the instant case, plaintiff was diagnosed at the hospital as suffering from syncope,[9] influenza A,[10] sinus tachycardia,[11] transaminitis,[12] and hypertension.[13] In their motion, the defendants do not expressly dispute that those conditions were "serious medical needs," and so, for the purposes of this opinion, the undersigned will simply assume that they were.

The defendants do, however, dispute any allegations that they acted with "deliberate indifference." Regarding the "deliberate indifference" prong of the analysis, the United States Fifth Circuit Court of Appeals has explained:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Rather, the plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Furthermore, the decision whether to provide additional treatment is a classic example of a matter for medical judgment. And, the failure to alleviate a significant risk that the official should have perceived, but did not is insufficient to show deliberate indifference.

<u>Domino v. Texas Department of Criminal Justice</u>, 239 F.3d 752, 756 (5th Cir. 2001) (citations, quotation marks, and brackets omitted). "Deliberate indifference encompasses only unnecessary

---

[9] The Court notes that syncope is a loss of consciousness caused by a temporary drop in the amount of blood flowing to the brain, such as results when there is drop in blood pressure or heart rate. In layman's terms, it is "fainting" or "passing out."
[10] Influenza A is a viral infection that attacks a person's respiratory system.
[11] Sinus tachycardia refers to an increased heart rate.
[12] Transaminitis refers to elevated levels of transaminases, a type of liver enzyme.
[13] Hypertension, in layman's terms, refers to high blood pressure.

and wanton infliction of pain repugnant to the conscience of mankind." McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997); accord Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999).

Here, the crux of plaintiff's medical claim is that the defendants failed to initially recognize that he was in fact ill, instead believing that he was simply malingering. However, the mere fact that the diagnosis was ultimately proven wrong is not sufficient to support a federal constitutional claim. On the contrary, as already noted, "it is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference." Domino, 239 F.3d at 756; accord Gamble, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); Castro v. Louisiana, Civ. Action No. 08-4248, 2008 WL 5169401, at *4 (E.D. La. Dec. 8, 2008) (noting that an incorrect diagnosis of malingering "simply does not suffice to state a claim for deliberate indifference").

In their motion, the defendants suggest that plaintiff's claim against Floyd Brooks is that "Floyd Brooks exercised deliberate indifference by placing Plaintiff on extreme suicide watch with 'four point restraints with helmet.'"[14] Although plaintiff does not clearly state the basis for his claim against Floyd Brooks, if the defendants' interpretation of the claim is accurate (and it must be noted that plaintiff does not dispute that interpretation in his opposition), then the claim is likewise meritless.

As an initial matter, it is unclear whether an inmate has a constitutional right not to be placed on suicide watch without adequate cause. See Langlinais v. Nelson Coleman Correctional

---

[14] Rec. Doc. 16-1, p. 2.

Center, Civ. Action No. 13-3003, 2015 WL 225222, at *6-7 (E.D. La. Jan. 15, 2015) ("[T]he Court simply cannot say that an inmate has a clearly established *constitutional right* not to be placed on suicide watch without probable cause. On the contrary, a number of cases have expressly found that there is no such constitutional right."); see also Jones v. Blackburn, No. 3:14-cv-01229, 2014 WL 2480601, at *6 (M.D. Tenn. June 2, 2014) ("There is no constitutional right to avoid being placed on suicide watch."); Hunter v. Williams, No. 3:13-cv-00592, 2013 WL 3467097, at *2 (M.D. Tenn. July 10, 2013) ("[B]ecause there is no liberty interest in assignment to any particular prison, or housing unit within a prison, the plaintiff has no due process claim for being placed on suicide watch."); Starks v. Couch, Civ. Action No. 08-cv-407, 2009 WL 331357, at *2 (S.D. Ill. Feb. 11, 2009) ("Starks has not stated a claim for a due process ... violation because there is no constitutional right to avoid being placed on suicide watch.").

Nevertheless, even if the Court assumes for the purposes of this decision that such a right exists, it was not violated here. As plaintiff concedes, Floyd Brooks placed plaintiff on suicide watch **after** receiving reports from **multiple** officers that he was engaging in self-harming behavior. It was therefore then incumbent on him to act to protect plaintiff. Moreover, as the United States Fifth Circuit Court of Appeals has explained, "suicide is inherently difficult to predict, particularly in the depressing prison setting, and **an incorrect diagnosis regarding the genuineness of a suicide threat does not amount to deliberate indifference**." Young v. McCain, 760 F. App'x 251, 257 (5th Cir. 2019) (emphasis added; quotation marks, brackets, and ellipsis omitted). That is especially true because the stakes are so high for both the inmate and the mental health professional, and it is natural (and permissible) for the mental health professional to err on the side of caution in such matters. Indeed, if Brooks had ignored the reports, not placed

plaintiff on suicide watch, and plaintiff had then committed suicide, Brooks might well have been liable for failing to take preventative measures.  See, e.g., Lewis v. Parish of Terrebonne, 894 F.2d 142, 145-46 (5th Cir. 1990); Etheridge v. Tanner, Civ. Action No. 19-295, 2019 WL 5072089, at *9 (E.D. La. Sept. 19, 2019), adopted, 2019 WL 5067129 (E.D. La. Oct. 8, 2019); Stewart v. Warner, Civ. Action No. 13-4759, 2014 WL 3498165, at *4 (E.D. La. July 15, 2014).

Because plaintiff's allegations are insufficient to plausibly allege deliberate difference, this claim should be dismissed.

## B.  Excessive Force

To the extent that plaintiff is claiming that the defendants used excessive force against him, that claim likewise implicates the Eighth Amendment's prohibition against cruel and unusual punishments.  "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 6 (1992) (quotation marks omitted).  Regarding such claims, the United States Fifth Circuit Court of Appeals has explained:

> Several factors are relevant in the inquiry whether unnecessary and wanton infliction of pain was used in violation of a prisoner's eighth amendment right to be free from cruel and unusual punishment.  These include:
>
> 1. the extent of the injury suffered;
> 2. the need for the application of force;
> 3. the relationship between the need and the amount of force used;
> 4. the threat reasonably perceived by the responsible officials; and
> 5. any efforts made to temper the severity of a forceful response.

Hudson v. McMillian, 962 F.2d 522, 523 (5th Cir. 1992).  "Of course, these identified factors are not exclusive; each case must be judged on its own facts."  Baldwin v. Stalder, 137 F.3d 836, 839

(5th Cir. 1998).  Nevertheless, a court is to consider each of the <u>Hudson</u> factors in its analysis of

an excessive force claim.  <u>See</u> <u>Jones v. Primrose</u>, 176 F. App'x 518, 519 (5th Cir. 2006).

## 1.  Extent of the Injury Suffered

"Obviously, the absence of serious injury is quite relevant to an excessive force inquiry,

but does not alone preclude relief."  <u>Baldwin</u>, 137 F.3d at 839.  On the contrary, the United States

Supreme Court has held:

> When prison officials maliciously and sadistically use force to cause harm,
> contemporary standards of decency are violated.  This is true whether or not
> significant injury is evident. Otherwise, the Eighth Amendment would permit any
> physical punishment, no matter how diabolic or inhuman, inflicting less than some
> arbitrary quantity of injury.

<u>Hudson</u>, 503 U.S. at 9 (citation omitted). However, the Supreme Court subsequently clarified the

foregoing statement, explaining:

> This is not to say that the absence of serious injury is irrelevant to the Eighth
> Amendment inquiry.  The extent of injury suffered by an inmate is one factor that
> may suggest whether the use of force could plausibly have been thought necessary
> in a particular situation.  The extent of injury may also provide some indication of
> the amount of force applied.

<u>Wilkins v. Gaddy</u>, 559 U.S. 34, 37-38 (2010) (internal citations, quotation marks, and brackets

omitted).  In summary, "[i]njury and force … are only imperfectly correlated, and it is the latter

that ultimately counts.  An inmate who is gratuitously beaten by guards does not lose his ability to

pursue an excessive force claim merely because he has the good fortune to escape without serious

injury."  <u>Id.</u> at 38.

There were two alleged uses of force in this case:  the alleged "slamming" of plaintiff onto

the stretcher and the purported "dragging" of him to the shower.  However, after both of those uses

of force, plaintiff was examined by the prison's medical staff and no injuries were found.  Further,

shortly thereafter plaintiff was transported to the hospital, and although he was diagnosed at that time with multiple ailments related to his illness, there is no suggestion that he was diagnosed with any injuries that could conceivably have been linked to the two uses of force.

## 2. Need for the Application of Force

"The amount of force that is constitutionally permissible … must be judged by the context in which that force is deployed." Ikerd v. Blair, 101 F.3d 430, 434 (5th Cir. 1996). "To this end, when evaluating Hudson factors, the finder of fact must keep in mind that prison officials may have had to act quickly and decisively. Accordingly, they are entitled to wide-ranging deference." Baldwin, 137 F.3d at 840 (citation and quotation marks omitted).

Further, obviously, the use of force may be appropriate in some circumstances to restore discipline and control a "recalcitrant inmate." See, e.g., Jones v. Shields, 207 F.3d 491, 496 (8th Cir. 2000); Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996). "When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force." Soto v. Dickey, 744 F.2d 1260, 1267 (7th Cir. 1980). While some may suggest that "rather than seek to enforce orders, it [is] possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way." Id. On the contrary:

> Discipline … is essential if [a] prison is to function and provide for the care, safety and security of the staff and inmates. Services to provide food, clothing, health, medical, cleaning, laundry and all other services would come to end without discipline. Mob rule would take over. There would not, and could not, be any protection for staff or inmates. Orders given must be obeyed. Inmates cannot be

> permitted to decide which orders they will obey, and when they will obey them.
> Someone must exercise authority and control.

Id.

While plaintiff insists that due to illness he was unable to comply with the officers' orders, the officers were unaware that he was actually ill, reasonably believed him to be simply non-compliant or defiant, and were therefore allowed to use some measure of force to enforce compliance.[15]

### 3. Relationship between the Need for the
### Application of Force and the Amount of Force Used

Based on the foregoing finding that some amount of force was seemingly needed to restore discipline, the next question which arises is whether the amount of force used in this case bore a reasonable relationship to the need. It did.

In cases in which prisoners allege that excessive force was used against them to enforce compliance, it is not uncommon for the Court to see allegations of the use of chemical sprays, Tasers, and beatings. No such allegations are made here. At worst, plaintiff alleges that he was "slammed" onto the stretcher and later "dragged" to the shower. However, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Hudson, 503 U.S. at 9. Rather:

> The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "'repugnant to the conscience of mankind.'" Whitley [v. Albers], 475 U.S. [312,] 327, 106 S.Ct. [1078,] 1088 [(1986)] (quoting Estelle [v. Gamble], 429 U.S. [97,] 106, 97 S.Ct. [285,] 292 [(1976)] (internal quotation marks omitted).

---

[15] The Court is aware that it was later discovered that plaintiff was in fact ill at that time as he claimed, and, therefore, his refusal may have stemmed from an actual inability to comply with the orders rather than simply an unwillingness to comply. However, again, the officers did not know that – all indications (including the opinions of the medical staff) were that plaintiff was malingering.

Id. at 9-10.  Given the circumstances here, including the fact that plaintiff was not complying with the officers' orders, the amount of force they used to enforce compliance was hardly so egregious as to be deemed "repugnant to the conscience of mankind."

### 4.  Threat Reasonably Perceived by the Responsible Officials

This Hudson factor is the weakest for the defendants, given that plaintiff was obviously posing no direct and imminent physical threat to anyone.  However, "that is not the only type of threat which must be considered."  Martin v. Seal, Civ. Action No. 11-726, 2014 WL 2890125, at *6 (E.D. La. June 25, 2014).  For example, while a prisoner's "flagrant disobedience" might pose no immediate physical threat, it, if ignored without consequence, can obviously embolden other prisoners to misbehave, thereby disrupting prison order and security.  See id.

### 5.  Efforts Made to Temper the Severity of a Forceful Response

A prison official may temper the severity of the use of force in a variety of ways.  For example, of import here, one way that can be accomplished is to ensure that the prisoner is afforded medical attention.  See, e.g., Martin v. Seal, 510 F. App'x 309, 313 (5th Cir. 2013).  In this case, immediately after both uses of force (the alleged "slamming" of plaintiff onto the stretcher and the purported "dragging" of him to the shower), plaintiff was examined by the prison's medical personnel and checked for injuries, none of which were found.

In summary, no Hudson factor weighs heavily in plaintiff's favor, and most, if not all, weigh more heavily in the defendants' favor.  Therefore, when those factors are considered, it cannot be said that plaintiff has stated a plausible excessive force claim.

### C.  Body-Cavity Search

When a prisoner complains of an unreasonable body-cavity search, his claim "sounds under the Fourth Amendment, which provides the proper analysis under our precedent for challenges to prison searches." Parker v. Woods, 834 F. App'x 92, 95 (5th Cir. 2020).  Further, regarding such claims, the United States Fifth Circuit Court of Appeals has explained:

> "The Fourth Amendment ... requires that 'searches or seizures conducted on prisoners must be reasonable under all facts and circumstances in which they are performed.'" Elliott [v. Lynn], 38 F.3d [188,] 191 [(5th Cir. 1994)] (quoting United States v. Lilly, 576 F.2d 1240, 1244 (5th Cir. 1978)).  Courts "must balance the need for the particular search against the invasion of the prisoner's personal rights caused by the search ... consider[ing] the 'scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" Moore [v. Carwell], 168 F.3d [234,] 237 [(5th Cir. 1999)] (quoting Bell [v. Wolfish], 441 U.S. [520,] 559, 99 S.Ct. 1861 [(1979)]).  Proving the reasonableness of an inmate search, however, imposes only a "light burden" on prison officials, "[b]ecause a prison administrator's decisions and actions in the prison context are entitled to great deference from the courts." Elliott, 38 F.3d at 191 (citing Lilly, 576 F.2d at 1245); see also Hay v. Waldron, 834 F.2d 481, 486 (5th Cir. 1987) (courts "ordinarily should defer" to prison officials, "[i]f a policy is reasonably related to legitimate security objectives and there is no substantial evidence to indicate that prison officials have exaggerated their response to security considerations").  Ultimately, courts must "strik[e] a balance 'in favor of deference to prison authorities' views of institutional safety requirements against the admittedly legitimate claims of inmates not to be searched in a humiliating and degrading manner.'" Elliott, 38 F.3d at 191 (quoting Watt v. City of Richardson Police Dep't, 849 F.2d 195, 196 (5th Cir. 1988)).

Id.

Here, there is no basis for a conclusion that the defendants' actions regarding the body-cavity search were unreasonable.  At the time it was ordered, plaintiff was suspected of self-harming behavior and so was being placed on extreme suicide watch; therefore, it was not unreasonable to perform such a search to ensure that he was not in possession of any contraband he could use to harm himself.  Moreover, the search was conducted in a reasonable manner – it

was performed by a physician of the same sex in the infirmary, and there are no allegations that the search was performed in the presence of anyone other than the medical and security staff or in the presence of anyone of the opposite sex. Given these considerations, plaintiff fails to state a plausible claim that his rights under the Fourth Amendment were violated.

### D.  Placement in Disciplinary Segregation and Deprivation of a Mattress

As to plaintiff's allegation that he was placed in disciplinary segregation and deprived of a mattress for fifteen and one-half hours per day, such allegations are commonly asserted by RCC inmates and are routinely found not to rise to the level of constitutional violations. For example, as one United States Magistrate Judge of this Court exhaustively explained when addressing similar allegations asserted by another RCC inmate:

> [Plaintiff's] claims that his constitutional rights were violated based on false or fabricated disciplinary charges resulting in his placement in extended lockdown and loss of privileges fail to state a claim of violation of his constitutional rights and must be dismissed.
>
> In Sandin v. Connor, 515 U.S. 472, 481-83 (1995), the United States Supreme Court held that analysis of a prisoner's due process rights relating to his placement in lockdown or other denial of prison privileges as disciplinary punishment begins with determining whether a constitutionally protected liberty interest exists. "Liberty interests protected by the Fourteenth Amendment may arise from two sources – the Due Process Clause itself and the laws of the States." Hewitt v. Helms, 459 U.S. 460, 466 (1983). In Sandin, the Supreme Court recognized that, although the States may create liberty interests, "these interests will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (citations omitted). Thus, in Sandin, when a prisoner was placed in disciplinary segregation for 30 days and the placement did not inevitably affect the duration of his sentence, the Court held that due process does not require that a prisoner be afforded the procedural mechanisms previously prescribed in Wolff v. McDonnell, 418 U.S. 539 (1974), and Hewitt, 459 U.S. at 460.
>
> "[T]he Due Process Clause does not protect every change in conditions of confinement which has a substantial adverse effect upon a prisoner." Madison v. Parker, 104 F.3d 765, 767 (5th Cir. 1997). "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which

they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." Wilkinson v. Austin, 545 U.S. 209, 225 (2005) (citations omitted). The Fifth Circuit in Madison held that a prisoner's 30-day commissary and cell restrictions imposed as punishment for disciplinary violations were "merely changes in the conditions of his confinement and do not implicate due process concerns." Madison, 104 F.3d at 768; accord Hernandez v. Velasquez, 522 F.3d 556, 563 (5th Cir. 2008); Dixon v. Hastings, 117 F. App'x 371, 372 (5th Cir. 2005); Milch v. Thayer, 211 F.3d 953, 957-58 (5th Cir. 2000). In Hernandez and Madison, the Fifth Circuit held that such restrictions do not represent the type of atypical, significant deprivation in which a state might create a liberty interest. Hernandez, 522 F.3d at 563; Madison, 104 F.3d at 768.

....

Examples of prison hardships that would qualify as so atypical and significant as to implicate due process considerations include unwanted administration of anti-psychotic drugs, involuntary commitment to a mental hospital and extension of the prisoner's sentence for his underlying criminal conviction. Sandin, 515 U.S. at 484. In addition, the Supreme Court has held that solitary confinement in a "Supermax" facility imposes an atypical and significant hardship that creates a liberty interest in avoiding such a placement when all of the following factors are taken together: almost all human contact, including cell to cell conversation, is prohibited; the light is on for 24 hours per day; exercise is for 1 hour per day, but only in a small indoor room; the placement is indefinite and is reviewed just annually; and placement disqualifies an otherwise eligible inmate from parole consideration. Wilkinson, 545 U.S. at 223-24.

In the instant case, [plaintiff] alleges that he was placed and continues to be housed in lockdown based upon more than 100 rule violations. He testified that he had been in extended lockdown for about one year at the time of his Spears hearing. Sandin makes clear that no particular process is required, unless something more than a mere change in condition of confinement occurs. Sandin, 515 U.S. at 484; Madison, 104 F.3d at 768. [Plaintiff's] own testimony establishes that his stay in lockdown deprived him only of certain limited prison privileges, including canteen, telephone, outdoor recreation and mattress restrictions, without any "atypical, significant deprivation" that might rise to the level of constitutional concerns, such as loss of good time credits. See Lander v. Lamartiniere, 515 F. App'x 257, 259 (5th Cir. 2013) (loss of canteen privileges and transfers to different cellblocks did not implicate liberty interest that required due process); Johnson v. Livingston, 360 F. App'x 531, 532 (5th Cir. 2010) (citing Milch, 211 F.3d at 958) ("Loss of privileges and cell restriction do not implicate due process concerns."); Hernandez, 522 F.3d at 563 (distinguishing the "extreme conditions" described in Wilkinson and holding that non-disciplinary "confinement to a shared cell for twelve months with permission to leave only for showers, medical appointments and family visits ... is by no means an atypical prison experience"); Payne v. Dretke, 80 F. App'x 314, 2003 WL 22367564, at *1 (5th Cir. 2003) ("commissary and recreation restrictions [as disciplinary punishment] ... do not implicate a liberty interest under

the Due Process Clause"). [Plaintiff] has failed to make any showing that the time spent in lockdown extended his total time in prison or otherwise resulted in atypical, significant hardships. Sandin, 515 U.S. at 484; Hernandez, 522 F.3d at 563; Madison, 104 F.3d at 768. As the record stands, nothing about [plaintiff's] stay in lockdown, including his loss of privileges, resulted in a violation of his due process or other constitutional rights.

Smith v. Tanner, Civ. Action No. 18-3719, 2018 WL 6204617, at *9-10 (E.D. La. Nov. 5, 2018)

(Wilkinson, M.J.), adopted, 2018 WL 6199974 (E.D. La. Nov. 27, 2018) (Ashe, J.). Similarly,

another Magistrate Judge of this Court likewise rejected such claims, observing:

> Plaintiff does not allege that he lost any "good time" credits as a result of the disciplinary adjudication in question, only comforts such as the availability of a mattress during daylight hours as is customary for inmates subject to administrative segregation at RCC. See Smith v. Tanner, No. 18-CV-3719, 2018 WL 6204617 at 13-15 (E.D. La. Nov. 5, 2018), adopted, 2018 WL 6199974 (E.D. La. Nov. 27, 2018). Sanctions of this nature, "which are 'merely changes in the conditions of [an inmate's] confinement,' do not implicate due process concerns" as they do not impose an atypical or significant hardship beyond the ordinary incidents of prison life. Richard v. Quarterman, No. 07-CV-2893, 2007 WL 2688442 at *2 (S.D. Tex. Sept. 10, 2007) (quoting Madison v. Parker, 104 F.3d 765, 768 (5th Cir. 1997)); see also Hebrard v. Cain, No. 16-CV-10913, 2016 WL 4145793 at *3 (E.D. La. July 5, 2016), adopted, 2016 WL 4131389 (E.D. La. Aug. 8, 2016). The lack of a mattress during daylight hours or even for a continuous 24-hour period does not rise to the level of a constitutional violation. Smith, 2018 WL 6204617 at *13-15 (and cases cited therein).

Daniels v. Rester, Civ. Action No. 18-5292, 2019 WL 1522519, at *2 (E.D. La. Jan. 28, 2019)

(North, M.J.), adopted, 2019 WL 1517724 (E.D. La. Apr. 8, 2019) (Lemmon, J.); accord Young

v. McCain, 760 F. App'x 251, 257 (5th Cir. 2019) ("[T]his court has affirmed dismissals of § 1983

challenges to isolation conditions as frivolous where an inmate was denied a mattress and bedding

only during daytime hours for an unspecified number of days. See Hadwin v. Stalder, 196 F.

App'x 293, 293 (5th Cir. 2006) (unpublished); Alex v. Stalder, 225 F. App'x 313, 314 (5th Cir.

2007) (unpublished). Accordingly, [plaintiff] has failed to show that the district court erred in

dismissing his conditions of confinement claim based on his deprivation of a mattress and bedding.").

For the same reasons, plaintiff's allegations fail to state a plausible claim. Because he does not allege that his disciplinary convictions resulted in the loss of "good time" or in the imposition of any "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Sandin forecloses that aspect of his claim. Moreover, circuit precedent likewise forecloses his contention that the Constitution prohibits prison officials from depriving a prisoner in disciplinary segregation of a mattress during daytime hours.

### E. Retaliation

Lastly, plaintiff alleges that all of the foregoing actions were taken to retaliate against him. As an initial matter, the Court notes that, for the purposes of a retaliation claim, it is not determinative that the foregoing actions did not, in and of themselves, violate plaintiff's constitutional rights, because the primary focus of a retaliation claim is a defendant's **motivation**. Therefore, as the United States Fifth Circuit Court of Appeals has explained: "An action motivated by retaliation for the exercise of a constitutionally protected right is actionable, **even if the act, when taken for a different reason, might have been legitimate**." Woods v. Smith, 60 F.3d 1161, 1165 (5th Cir. 1995) (emphasis added).

Further, with respect to retaliation claims, the United States Fifth Circuit Court of Appeals has held:

> To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation. Causation requires a showing that but for the retaliatory motive the complained of incident would not have occurred.

McDonald v. Steward, 132 F.3d 225, 231 (5th Cir. 1998) (citation, internal quotation marks, and ellipsis omitted). Plaintiff's allegations are sufficient to meet all four of those prongs.

Here, plaintiff alleges that the actions were taken against him because he filed administrative grievances and a lawsuit. That allegation suffices for the first prong. "The law of this circuit is clearly established … that a prison official may not retaliate against or harass an inmate for exercising the right of access to the courts, or for complaining to a supervisor about a guard's misconduct." Woods, 60 F.3d at 1164.

On the second prong, plaintiff expressly alleges that the defendants intended to retaliate against him because of his exercise of that right. That likewise suffices. Although a prisoner claiming retaliation must either produce direct evidence of retaliatory motivation or allege a chronology of events from which retaliation may plausibly be inferred, see id. at 1166, plaintiff in fact alleges that he has direct evidence: the defendants **admitted** that was their motivation. Specifically, plaintiff alleges: "This all was done as retaliation for pass A.R.P.'s, and lawsuit that's pending. How I know? **I was told this over and over from L.T Williams, L.T Brooks, Major Rigdon, L.T Hill.**"[16] Whether plaintiff can actually prove that such admissions were made is an issue for another day; for the purposes of the instant Rule 12(b)(6) motion, it is sufficient that he has alleged that they were. As noted, for now, the Court must accept plaintiff's allegations as true. See, e.g., Johnson v. Wells, 566 F.2d 1016, 1017 (5th Cir. 1978) ("The allegations of a complaint filed under Section 1983 must be accepted as true when the judge evaluates them to see whether they state a claim.").

---

[16] Rec. Doc. 1, p. 7 (emphasis added).

The third prong also obviously poses no obstacle here. The actions alleged, including but not limited to plaintiff's placement in segregation, were "adverse" ones. See, e.g., Brunson v. Nichols, 875 F.3d 275, 277 (5th Cir. 2017) ("Disciplinary segregation and loss of privileges may constitute an adverse act.").

On the fourth prong, it may ultimately be difficult for plaintiff to establish "but for" causation; however, again, he is not required to make that showing at this stage of the proceeding. Rather, to survive a motion to dismiss, he need only plausibly allege causation, and he has done so. See, e.g., id. at 278.

Lastly, although the defendants assert in their motion that they are entitled to qualified immunity, that assertion does not defeat this retaliation claim. As the Fifth Circuit noted in Woods:

> The defense of qualified immunity protects a public official from both litigation and liability, absent a showing that the official violated a constitutional right that was clearly established at the time of the incident. In assessing the defense we must first inquire whether the plaintiff has asserted the violation of a clearly established constitutional right. If that inquiry is answered in the affirmative, we then determine whether the defendant's conduct was objectively reasonable in light of the established law.

Woods, 60 F.3d at 1164 (footnotes omitted). For the reasons herein, plaintiff has asserted a violation of a constitutional right and the right in question was clearly established at the time of the defendants' actions. See id. Moreover, it cannot be said at this stage of the proceedings that the defendants' actions were objectively reasonable in light of that clearly established law, especially given plaintiff's allegation that they expressly admitted they were acting with retaliatory animus.

For these reasons, defendants' motion should be denied as to plaintiff's retaliation claim, and that claim should be allowed to proceed pending further development.

### III. *Sua Sponte* Dismissal of the Claims Against Warden Billy Anderson

Finally, as previously noted, Warden Billy Anderson did not join in the motion to dismiss because he has not yet been served.   Nonetheless, the Court should dismiss the claim against Anderson *sua sponte* under its screening authority for the following reasons.

Plaintiff filed this federal civil action *in forma pauperis*.   Concerning such actions, federal law provides:

> Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action …
>
> (i)    is frivolous or malicious;
> (ii)   fails to state a claim on which relief may be granted; or
> (iii)  seeks monetary relief against a defendant who is immune from such relief.

28 U.S.C. § 1915(e)(2)(B).

In addition, because plaintiff is incarcerated, he is also subject to the screening provisions of 28 U.S.C. § 1915A.   That statute mandates that federal courts "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity."   28 U.S.C. § 1915A(a).   Regarding such lawsuits, federal law similarly requires:

> On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint –
>
> (1)    is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
> (2)    seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A(b).

"Plaintiffs suing governmental officials in their individual capacities ... must allege specific conduct giving rise to a constitutional violation.  This standard requires more than conclusional assertions:  The plaintiff must allege specific facts giving rise to the constitutional claims."  Oliver v. Scott, 276 F.3d 736, 741 (5th Cir. 2002) (citation omitted).  Moreover, "[p]ersonal involvement is an essential element of a civil rights cause of action."  Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983).

Here, however, plaintiff makes only a single allegation against Warden Billy Anderson in the complaint, namely that Anderson ordered Dr. Cleveland to perform the body-cavity search in connection with plaintiff's placement on extreme suicide watch.  However, as already explained in this opinion, that search was reasonable and did not violate plaintiff's constitutional rights.  Therefore, even if it was in fact Anderson who ordered the search, his order did not result in a violation of plaintiff's constitutional rights.  Therefore, the claim against Anderson should be dismissed as frivolous and/or for failure to state a claim upon which relief may be granted.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the motion to dismiss filed by Dr. Robert Cleveland, Nurse Michael Peters, Lt. Randall Williams, Floyd Brooks, Sgt. Larry Daigle, and Lt. Douglas Brooks, Rec. Doc. 16, be **GRANTED IN PART AND DENIED IN PART**.  It is **RECOMMENDED** that the motion be **GRANTED** with respect to all of plaintiff's claims against those defendants **EXCEPT** the retaliation claim, and it is **FURTHER RECOMMENDED** that all claims against those defendants **EXCEPT** that retaliation claim be **DISMISSED WITH PREJUDICE**.  It is **RECOMMENDED** that the motion be **DENIED** with respect to plaintiff's

retaliation claim against those defendants and that claim be allowed to proceed pending further development.

It is **FURTHER RECOMMENDED** that plaintiff's claim against Warden Billy Anderson be **DISMISSED WITH PREJUDICE** as frivolous and/or for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ___5th___ day of March, 2021.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**